IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KRISTY M. ALBRECHT as Mother And Next Best Friend for the Minor, N.S.S., | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 1:21-cv-02016 |
| v. | ) ) | Honorable Charles P. Kocoras |
| DICK'S SPORTING GOODS, INC., | ) ) ) | |
| Defendant. | ) | |

**KRISTY M ALBRECHT as mother and next best friend for the minor, N.S.S.'S
RESPONSE TO DICK'S SPORTING GOODS, INC.'s LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS WITH SUPPORTING EXHIBITS**

NOW COMES KRISTY M ALBRECHT as mother and next best friend for the minor, N. S. S. (N.S.S.) by and through his attorney, James F. Coyne of Coyne Reinke Law and in Response to DICK'S SPORTING GOODS, INC.'s Statement of Material Facts pursuant to Local Rule 56.1, states as follows:

6. On February 27, 2020, N.S.S. was a sixth-grader at Geneva Middle School South, located in Geneva, Illinois. Exhibit C at 10:5-10; Exhibit D at 9:5-9.

RESPONSE: Admitted

7. February 27, 2020 was an early release day at Geneva Middle School South for parent/teacher conferences. Exhibit C at 45:7-13; Exhibit H at 13:7-9.

RESPONSE: Admitted

8. N.S.S. was released from school at 12:00 p.m. on February 27, 2020. Exhibit C at 10:20-22.

RESPONSE: Admitted

#270643v3

9. N.S.S. did not go home after school; he took the bus with his friend Christian Roitburd ("Roitburd") to Roitburd's home. Exhibit C at 11:9-12; 12:4-6.

RESPONSE: Admitted

10. N.S.S. had to receive written permission from Albrecht to take Roitburd's bus to Roitburd's home. Exhibit C at 12:7-13.

RESPONSE: Admitted

11. When N.S.S. and Roitburd arrived at Roitburd's home on February 27, 2020, Christian's mother was not there, but his babysitter, Marisa, was. Exhibit C at 15:7-8.

RESPONSE: Admitted

12. Roitburd also lived in Geneva, Illinois. Exhibit H at 9:1-11.

RESPONSE: Admitted

13. N.S.S. and Roitburd got to Roitburd's house at around 12:30 p.m. Exhibit C at 16:15-17.

RESPONSE: Admitted

14. N.S.S. and Roitburd played video games at Roitburd's house for about an hour. Exhibit C at 16-5.

RESPONSE: Admitted

15. While at Roitburd's home, N.S.S. and Roitburd were invited to the Geneva Commons by their school friends. Exhibit C at 17:2-24; 18:1; 18:12-16.

RESPONSE: Admitted

16. Roitburd's babysitter drove N.S.S. and Roitburd to the Geneva Dick's Sporting Goods store within the Geneva Commons at 618 Commons Drive, Geneva, Illinois (the "Subject Store"). Exhibit C at 18:17-20; Exhibit H at 18:9-13.

RESPONSE: Admitted

17. N.S.S. and Roitburd walked into the Subject Store at approximately 2:18 p.m. Exhibit M.

RESPONSE: Admitted

18. N.S.S. and Roitburd were accompanied by their minor friends/classmates Caleb Yi ("Yi") and Benjamin Barton ("Barton") in the Subject Store. Exhibit C at 22:21-24.

RESPONSE: Admitted

19. Neither Albrecht, Rotiburd's babysitter, Yi's parents, nor Barton's parents accompanied any of the boys inside the Subject Store. *Id.* at 23:3-4; Exhibit H at 21:10-15; Exhibit I at 16:9-11; and Exhibit J at 18:18-20.

RESPONSE: Admitted

20. The Subject Store was "steady" that day, meaning there was consistent customer traffic. Exhibit E at 24:23-24; 25:1-4.

RESPONSE: Admitted

21. N.S.S. did not intend to purchase anything from the Subject Store, nor did N.S.S. believe that his friends intended to purchase anything while they were at the Subject Store on February 27, 2020. Exhibit C at 71:21-24; 72:1-4.

RESPONSE: Admitted

22. There are two levels or floors at the Subject Store and two escalators. Exhibit C at 26:6-12; Exhibit H at 24:16-18; Exhibit I at 18:10-12; Exhibit J at 21:14-16; Exhibit K.

RESPONSE: Admitted

23. N.S.S. took the "up" escalator to reach the second level of the Subject Store. Exhibit C at 26:3-5.

RESPONSE: Admitted

24. On and before February 27, 2020, the escalators were functioning properly. Exhibit G at 21:3-12; Exhibit I at 21:5-8; Exhibit J at 27:1-3.

3

RESPONSE: Admitted

25. While upstairs at the Subject Store, N.S.S. looked at various sporting equipment, went to the boxing area, and then played catch with the footballs. Exhibit C at 30:1-5.

RESPONSE: Admitted

26. One of DSG's managers, Christine Toman ("Toman"), testified that N.S.S. and his friends were throwing balls over the railings on the second floor at customers below. Exhibit E at 27:19-21.

RESPONSE: Admitted

27. After playing with the footballs, N.S.S. proceeded to "screw around on the escalators." Exhibit C at 29:5-7; Exhibit I at 24:19-21.

RESPONSE: Admitted

28. N.S.S. described "screwing around on the escalators" to mean that he would sit on the escalator's moving handrail like he was sitting on a bike, travel approximately three feet, and swing his legs over to dismount the moving escalator. Exhibit C at 31:2-9; 32:10-20; Exhibit H at 29:11-23; Exhibit I at 22:4-16; Exhibit J at 22:22-24; 23:1-6; Exhibit K.

RESPONSE: Admitted

29. Customers are not permitted to straddle the handrail of the escalators at the Subject Store. Exhibit F at 22:22-24.

RESPONSE: Admitted

30. Before his fall, N.S.S. was facing forward while straddling the handrail on the "down" escalator. Exhibit C at 31:19-21.

RESPONSE: Admitted

31. N.S.S. straddled the handrail on the left-hand side of the "down" escalator. Exhibit C at 32:1-8.

RESPONSE: Admitted

4

32. Straddling the escalator's moving handrail and eventually dismounting took merely "seconds" to complete. Exhibit C at 55:7-11; Exhibit J at 25:13-16.

RESPONSE: Admitted

33. N.S.S. rode the handrail of the escalator five or six times before falling. Exhibit C at 54:15-20; Exhibit H at 31:16-20; 43:15-23; Exhibit L at ¶ 6.

RESPONSE: Admitted

34. N.S.S. understood the danger that riding the escalator's handrail posed but proceeded to do so anyway. Exhibit C at 33:13-15; 35:10-12; 36:1-6.

RESPONSE: Admitted

35. N.S.S. learned from Albrecht the correct way to ride an escalator approximately six years before his fall. Exhibit C at 33:16-22; 34:1-2; 35:16-18.

RESPONSE: Admitted

36. Moments before N.S.S.'s fall, Roitburd straddled and rode the escalator's handrail, and N.S.S. followed behind him. Roitburd had trouble swinging his leg off the handrail which momentarily prevented him from dismounting. During that brief moment of time, N.S.S. collided with Roitburd, and then came in contact with Roitburd's leg, which caused N.S.S. to fall off the escalator. Exhibit C at 37:14-22; 38:5-14; Exhibit E at 41:14-19; Exhibit H at 32:21-24; 33:1-22; Exhibit I at 25:20-24; 26:1-14; 26:20-23; Exhibit N.

RESPONSE: Admitted

37. N.S.S. testified that Roitburd hit his leg and that Roitburd hitting him was what made N.S.S. fall off the escalator. Exhibit C at 39:6-19.

RESPONSE: Admitted

38. N.S.S. fell forward off the escalator, landing on his chest/ribs. Exhibit C at 40:5-12.

RESPONSE: Admitted

5

39. N.S.S. fell approximately 18-20 feet. Exhibit E at 22:12-16.

RESPONSE: Admitted

40. N.S.S.'s friends took the escalator down the proper way to check on him. Exhibit C at 42:1-3; Exhibit N.

RESPONSE: Admitted

41. Roitburd assisted N.S.S. by giving N.S.S. his sweatshirt to cover N.S.S.'s head. Exhibit H at 34:16-20.

RESPONSE: Admitted

42. Toman arrived at the scene moments after N.S.S. fell. Exhibit E at pp. 39-40.

RESPONSE: Admitted

43. Toman approached and attempted to talk to N.S.S. so that she could help find N.S.S.'s mother or another family member to notify. Exhibit E at 41:1-9.

RESPONSE: Admitted

44. Toman then called an ambulance to get N.S.S. immediate medical assistance. Exhibit E at 40:16-20.

RESPONSE: Admitted

45. No DSG employees witnessed N.S.S. or Roitburd riding/straddling the escalator's handrail prior to N.S.S.'s fall. Exhibit E at 55:17-22; Exhibit F at 15:15-21; Exhibit G at 22:5-12.

RESPONSE: Admitted

46. No customers complained to DSG employees that other customers were "messing around on the escalators." Exhibit G at 21:3-12.

RESPONSE: Admitted

47. The above-described February 27 incident is the first time anyone has fallen off the escalator at the Subject Store. Exhibit E at 56:4-8; Exhibit F at 23:6-12; Exhibit G at 23:8-17.

RESPONSE: Admitted

48. No DSG employee has ever seen a customer straddle and/or ride the handrail on either escalator at the Subject Store. Exhibit E at 20:1-3; 36:4-9; and 56:9-13; Exhibit F at 23:1-5; Exhibit G at 23:4-7.

RESPONSE: Admitted

49. DSG's managers have the authority to remove customers from the store if that customer is riding the escalator's handrail. Exhibit E at 24:7-10.

RESPONSE: Admitted

50. In Toman's time at the Subject Store, she, nor any other DSG manager, has ever had to remove a child or customer from the store for riding one of the escalator's handrails. Exhibit E at 24:11-15.

RESPONSE: Admitted

Respectfully submitted,

/s/ James F. Coyne

James F. Coyne, Esq.
Coyne Reinke Law
1906 W Belmont Ave.
Chicago, Illinois 60657
(312) 855-0840

7